IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AHSAN AL REFAT,** | : | CIVIL ACTION NO. 1:19-CV-1507 |
| | : | |
| Plaintiff | : | (Judge Conner) |
| | : | |
| v. | : | |
| | : | |
| **FRANKLIN FINANCIAL SERVICES** | : | |
| **CORPORATION d/b/a F&M TRUST,** | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

Plaintiff Ahsan Al Refat ("Refat") filed this civil rights lawsuit against his former employer, defendant Franklin Financial Services Corporation d/b/a F&M Trust ("F&M Trust"). Refat alleges F&M Trust discriminated against him based on his status as a practicing Muslim and retaliated against him for requesting a religious accommodation. F&M Trust moves for summary judgment. We will deny F&M Trust's motion.

## I. Factual Background & Procedural History[1]

Refat's employment history with F&M Trust spans only two months, from February 2017 until April 2017. (See Doc. 21 ¶ 1). F&M Trust hired Refat as an assistant financial services officer in its Camp Hill Community Office. (See id. ¶¶ 1, 2). Refat's position was supervisory, and his direct reports included a woman named Makelle Mummart (also known as Makelle Evans). (See id. ¶ 3). Refat himself reported to several individuals, including Paulo Oliveira. (See id. ¶ 5).

The parties offer starkly divergent accounts of the events that led to Refat's departure from F&M Trust in April 2017. For his part, Refat testified that he is a practicing Muslim, and that he had at least two, and possibly three, conversations with F&M Trust leadership about a religious accommodation so that he could attend Jumu'ah, a Muslim prayer ritual, on Fridays. (See id. ¶¶ 15-16). Refat believes he spoke with Oliveira to generally inquire about the process of requesting an accommodation prior to April 11, 2017. (See id. ¶ 18(e)). On or around April 11, he spoke with Dr. Karen Carmack, F&M Trust's Chief Human Resources Officer, on the same topic. (See id. ¶ 18(a)-(h)). He again spoke with Dr. Carmack on or

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. PA. L.R. 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (See Docs. 21, 25, 26). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

2

around April 17.  (See id. ¶ 18(g)).  Refat stated Dr. Carmack instructed him to send her a formal email so she could "look into that."  (See id. ¶¶ 18(b), 18(g), 19-20).

Refat testified that "everything changed" after he asked about the accommodation.  (See Doc. 21-1, Refat Dep. 74:20-75:15).  He considered the conversations with Dr. Carmack discouraging—he "felt like [he] was being ignored" and believed Dr. Carmack was not "excited to hear about the request."  (See Doc. 21 ¶ 21).  Refat also indicated he did not consider his request to be odd or unusual; he has requested religious accommodations for Jumu'ah while employed for five other companies since 2001, and the request was always granted.  (See Refat Dep. 14:21-22:23).

F&M Trust accepts as true—solely for purposes of its Rule 56 motion—that Refat requested an accommodation in April 2017.  Its management posits that his termination had nothing to do with any accommodation request; instead, F&M Trust cites a human resources investigation into a sexual harassment claim against Refat as the basis for his dismissal.  F&M Trust points to an email Mummart sent to Oliveira and two other F&M Trust employees on the morning of April 17 (the same day Refat may have reapproached Dr. Carmack about a religious accommodation), with the subject line "Updates."  (See Doc. 21-9).  The email contained Mummart's recounting of her then-recent experiences working at F&M Trust.  (See id.)  The email also included statements that Mummart was uncomfortable working with Refat.  (See Doc. 21 ¶ 27).  Mummart noted Refat "talks about sexual stuff to me about his wife and parties he goes to."  (See id.; Doc. 21-9).  She further noted Refat informed her that "if his wife stops in, he must 'behave,'" and that he recounted an

3

incident where his wife found condoms in his bag. (See Doc. 21 ¶ 27; Doc. 21-9). According to Mummart's email, Refat told her "he carries some [condoms] around 'just in case.'" (See Doc. 21 ¶ 27; Doc. 21-9).

This email was sent to Dr. Carmack, who spoke with Mummart via phone and asked for additional information about her allegations against Refat. (See Doc. 21 ¶ 28). That afternoon, Mummart sent an email titled "Incidents," reiterating that Refat made the remarks described in her first email, as well as several others. (See id. ¶ 30; Doc. 21-10). She stated Refat "asked me if I believe in hug therapy" because he "does hugs" rather than shake hands. (See Doc. 21 ¶ 30(e)). She noted Refat made "comments about customers being hot or not" and told her he would flirt to get business, if needed. (See id. ¶ 30(c)). At one point, Refat told Mummart he noticed her name tag, then stated, "thank God you didn't take that the wrong way." (See id. ¶ 30(b)). When Mummart asked what he meant, Refat replied, "that I was looking at your boobs, which I may or may not have been." (See id.) Finally, Mummart stated Refat told her he found her on Google because she modeled for Harley Davidson, and had learned her previous address and the name of her ex-husband. (See id. ¶ 30(f)). Mummart claimed Refat instructed her that if a Harley Davidson event occurred, to "tell him so he can come watch and he said he will not bring his wife," and that "if his wife ever comes in he has to behave." (See id.)

Dr. Carmack, Oliveira, and a third F&M Trust employee then formally investigated Mummart's allegations. (See id. ¶ 33). The following day, April 18, Oliveira and Dr. Carmack interviewed Refat, and Refat denied everything. (See id. ¶¶ 34-35; Doc. 25 ¶¶ 34-35). The parties dispute the material contents of the

4

interview, including what was said and how long it lasted. (See Refat Dep. 82:22-99:9; Doc. 21-2, Oliveira Dep. 47:15-51:16; Doc. 21-5, Carmack Dep. 34:18-43:2). Dr. Carmack remembers the interview as open-ended, detailed, and at least 45 minutes long, and she recalls that Refat gave shifting, unreliable answers to their questions. (See Doc. 21 ¶¶ 34, 36; Carmack Dep. 27:12-27:19, 41:25-43:2, 52:17-52:23). According to Refat, the interview lasted roughly ten minutes and he was instructed to simply answer "yes or no" to Mummart's allegations. (See Doc. 25 ¶¶ 34, 36; Refat Dep. 85:3-85:25). In response to a document purporting to contain Dr. Carmack's notes of the interview, Refat accused Dr. Carmack of fabricating his interview responses. (See Refat Dep. at 93:8-94:2, 97:9-97:20, 98:7-98:19, 98:20-99:5).

After speaking with Refat, Mummart, and other employees, Dr. Carmack considered Mummart credible and Refat not credible, noting that Refat failed to maintain eye contact and "[h]is story changed," while Mummart gave "a lot of detail" and clearly answered follow-up questions. (See Doc. 21 ¶¶ 36-38; Doc. 25 ¶¶ 36-38). F&M Trust terminated Refat on the same day as the interview for violating its nondiscrimination and antiharassment policy. (See Doc. 21 ¶ 41). Refat had received training on these policies and had also received and signed an employee handbook describing F&M Trust's "zero tolerance" policy on harassment. (See id. ¶¶ 7-14). Approximately six months after Refat's termination, F&M Trust also fired Mummart for "dishonesty" regarding the details of a family member's funeral services. (See id. ¶ 44; Doc. 21-12 at 2).

As highlighted above, the parties have not resolved core factual disputes surrounding Refat's employment and termination. Refat considers the entire

5

investigation and the decision to fire him a manufactured pretext for religious discrimination and retaliation. (See Doc. 25 ¶ 38). For their part, Dr. Carmack and Oliveira both flatly deny Refat ever had conversations with either of them about a religious accommodation request. (See Doc. 21 ¶ 19 n.2). Both assert they did not know Refat was a practicing Muslim during his employment with F&M Trust. (See id.) Dr. Carmack testified that "no employee has ever requested a religious accommodation" during her two decades of employment with the company. (See Doc. 25 ¶ 50; Carmack Dep. 7:12-7:25, 14:5-15:4). Oliveira stated similarly that he has not handled a request for religious accommodation since he began working there in 2016. (See Doc. 25 ¶ 53; Oliveira Dep. 7:13-7:23, 16:7-19:1).

Refat filed a charge with the Pennsylvania Human Relations Commission less than two weeks after his termination, averring that he had requested time off on Fridays to "go to mosque to pray" around April 11, and that he had been instructed to "send Karen an email." (See Doc. 21-8 at 6). He also cross-filed a complaint with the Equal Employment Opportunity Commission. (See Doc. 1 ¶ 8). Refat filed the instant suit in August 2019, alleging religious discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as well as identical claims under the Pennsylvania Human Relations Act, ("PHRA"), 43 PA. STAT. AND CONS. STAT. ANN. § 951 *et seq.* F&M Trust moves for summary judgment on all of Refat's claims. The motion is fully briefed and ripe for disposition.

## II. Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial

would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court is to view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. See Pappas, 331 F. Supp. 2d at 315.

## III. Discussion

Refat alleges both discrimination due to his status as a practicing Muslim, and retaliation in response to his request for a religious accommodation.[2] Refat's discrimination and retaliation claims are distinct; however, both follow the same burden-shifting framework, and F&M Trust's motion rests on Refat's burden to prove pretext for each claim.

---

[2] Refat's complaint does not specify the statutory subsections or theories on which he bases his cause of action. (See generally Doc. 1). F&M Trust's motion and brief assume Refat could be proceeding on a "failure to accommodate" theory. (See Doc. 22 at 7). Refat's briefing sheds no light on this issue. (See Doc. 24). However, Refat does not allege his request for accommodation was ever granted or denied. (See Doc. 21 ¶ 23). Because "failure to accommodate a religious practice" is part of a disparate-treatment claim, we do not conduct a separate analysis on this point. See EEOC v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768, 773 (2015).

7

## A. *Religious Discrimination Claims*

Title VII makes it unlawful for an employer to "discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).[3] Religion is defined as "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). The Supreme Court of the United States in 2015 stated that Title VII confers "favored treatment" on religious practices, and "an employer who acts with the motive of avoiding [a religious] accommodation may violate Title VII." See Abercrombie & Fitch Stores, 575 U.S. at 773, 775.

The court analyzes religious discrimination claims under the three-step burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). See Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 281 (3d Cir. 2001). First, a plaintiff must establish a *prima facie* case of discrimination by sufficient evidence, direct or circumstantial, that (1) he was a member of a protected class, (2) he was qualified for the position for which he applied, (3) he suffered an adverse employment action, and (4) the circumstances of

---

[3] The PHRA similarly makes it unlawful to discharge an individual from employment "because of the . . . religious creed . . . of any individual." 43 PA. STAT. AND CONS. STAT. ANN. § 955(a). Courts review PHRA claims under the same standards as Title VII claims. See Connelly v. Lane Constr. Corp., 809 F.3d 780, 791 n.8 (3d Cir. 2016) (citing Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317 n.3 (3d Cir. 2000)).

8

the adverse employment action give rise to an inference of discrimination. McDonnell Douglas, 411 U.S. at 802; Abramson, 260 F.3d at 281-82.

Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. See McDonnell Douglas, 411 U.S. at 802; Abramson, 260 F.3d at 282. The defendant's burden at this this stage is "'relatively light,'" and is a burden of production only. See Burton v. Teleflex, Inc., 707 F.3d 417, 426 (3d Cir. 2013) (quoting Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006)). A plaintiff must then show that the defendant's reason for the employment decision was a mere pretext for discrimination. See McDonnell Douglas, 411 U.S. at 804-05; Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994); Abramson, 260 F.3d at 283. If the plaintiff is able to demonstrate pretext, the factfinder may infer discrimination from its "rejection of the employer's proffered reason," and no additional evidence is required. See Burton, 707 F.3d at 427 (citing Fuentes, 32 F.3d at 764; Fasold v. Justice, 409 F.3d 178, 185 (3d Cir. 2005)). Evidence can "serve both to establish a *prima facie* case and discredit a defendant's explanation." See Dillon v. Coles, 746 F.2d 998, 1003 (3d Cir. 1984); see also Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 256 n.10 (1981).

To demonstrate pretext and defeat summary judgment, a plaintiff must identify evidence that would allow the factfinder to "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Shaner v. Synthes, 204 F.3d 494, 501 (3d Cir. 2000) (quoting Fuentes, 32

9

F.3d at 764). The plaintiff may point out "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons." See Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015) (quoting Fuentes, 32 F.3d at 764). The plaintiff can also point to evidence that the employer previously discriminated against him; discriminated against others in the plaintiff's protected class; or treated others who were similarly situated, but not in plaintiff's protected class, more favorably than it treated the plaintiff. Id. at 645 (citing Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645 (3d Cir. 1998)). However, a plaintiff endeavoring to demonstrate pretext cannot "simply show that the employer's decision was wrong or mistaken." See Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (quoting Fuentes, 32 F.3d at 765). The plaintiff must offer "evidence contradicting the *core facts* put forward by the employer as the legitimate reason for its decision." Tomasso, 445 F.3d at 706 (quoting Kautz, 412 F.3d at 467).

F&M Trust does not dispute Refat's *prima facie* case for purposes of its motion, and it has proffered a legitimate nondiscriminatory reason for its decision to terminate Refat's employment—namely, that he engaged in sexual harassment. (See Doc. 22 at 4-12; Doc. 27 at 2-10). Thus, the only dispute is pretext. We note at the outset that Refat does not rely on extrinsic evidence of discriminatory bias on the part of F&M Trust to establish pretext; he neither claims nor substantiates, for example, that F&M Trust previously discriminated against him or other religious employees, or treated similarly situated, nonreligious employees more favorably. Cf. Willis, 808 F.3d at 645. Thus, to demonstrate pretext, Refat must point to

10

"weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in F&M Trust's proffered reason for firing him. Cf. Fuentes, 32 F.3d at 764.

The pretext inquiry *sub judice* presents a close case that turns almost entirely on credibility disputes. We are presently confronted with two parallel and diametrically opposed sets of "core facts." Cf Tomasso, 445 F.3d at 706. Refat's position is not new; he filed a charge in May 2017 with the Pennsylvania Human Relations Commission in which he averred that he requested time off on Fridays to "go to mosque to pray." (See Doc. 21-8 at 6). A factfinder who credits Refat's testimony about his multiple requests for accommodation would likely discredit as "implausible" the assertions by Carmack and Oliveira that Refat never mentioned his Islamic faith, Jumu'ah, or the need for an accommodation. Cf. Willis, 808 F.3d at 644. If Refat's version of events is credible, the factfinder could reasonably "disbelieve the employer's articulated legitimate reasons" for firing him just a single day after he renewed his request for a religious accommodation. Cf. Shaner, 204 F.3d at 501.

On the other hand, F&M Trust argues that Refat's faith never entered the picture; he was summarily fired after Mummart made serious, detailed, and credible allegations of sexual harassment against him. (See Doc. 21 ¶¶ 36-41; Doc. 21-11 at 2). A factfinder who credits F&M Trust would likely consider Refat the fabricator. Under this view, Refat sued in response to an investigation that he considered unfair, conveniently aligning his purported accommodation requests

with the harassment allegations for which he was terminated.[4]  At the summary judgment stage, we make no credibility determinations, and draw all reasonable inferences in favor of Refat as the nonmovant.  See Thomas, 749 F.3d at 222.

At this juncture, summary judgment is inappropriate on Refat's religious discrimination claims due to the genuine, threshold disputes of material fact surrounding his employment with F&M Trust.  We will deny F&M Trust's motion on these claims.

### B. *Retaliation Claims*

Title VII also prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).[5]  To establish a *prima facie* case of retaliation under Title VII, a plaintiff must present evidence that (1) he engaged in a protected activity, (2) he

---

[4] We reiterate here that the ultimate truth or falsity of Mummart's allegations is not relevant to our resolution of this case, only whether F&M Trust relied on them to terminate Refat.  After F&M Trust produced a legitimate, nondiscriminatory or nonretaliatory reason for termination, the "sole remaining issue is discrimination *vel non*."  See Vernon v. A & L Motors, 381 F. App'x 164, 168 (3d Cir. 2010) (nonprecedential) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)).  The jury must only decide whether discrimination was the "real reason" for Refat's termination.  See Fuentes, 32 F.3d at 763 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)).

[5] The PHRA similarly forbids discrimination "against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act."  43 PA. STAT. AND CONS. STAT. ANN. § 955(d).  Our court of appeals applies the same analytical framework to PHRA retaliation claims as to Title VII retaliation claims.  Connelly, 809 F.3d at 791 n.9.

12

suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action. See Carvalho-Grevious v. Del. State Univ., 851 F.3d 249, 257 (3d Cir. 2017) (citing Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006)). Due to the causal connection requirement, retaliation claims often focus on the timing between an employee's activity and the adverse employment action, and timing may be indicative of causation if it is "unusually suggestive of retaliatory motive." See Shaner, 204 F.3d at 505 (citing Krouse v. Am. Sterilizer, 126 F.3d 494, 503 (3d Cir. 1997)). In rare cases, "temporal proximity between the protected activity and the termination is sufficient to establish a causal link." See Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997) (citing Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (two-day lapse between protected activity and termination sufficient to infer causation)).

Title VII retaliation claims also follow the McDonnell Douglas burden-shifting framework. Carvalho-Grevious, 851 F.3d at 257 (citing Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 198 (3d Cir. 2015)). If the employee succeeds in making his *prima facie* case, the burden shifts to the employer to produce a legitimate, nonretaliatory reason. Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003). After the employer articulates such a reason, the plaintiff bears the burden of demonstrating that the given explanation is mere pretext and "unworthy of credence." Carvalho-Grevious, 851 F.3d at 262 (quoting Daniels, 776 F.3d at 199).

As with the discrimination claims, F&M Trust concedes only for the purpose of summary judgment that Refat has stated a *prima facie* case of retaliation,[6] and focuses on pretext. For the reasons outlined *supra* in Section II(A), summary judgment at this juncture is improper: if a factfinder credits Refat's assertion, it becomes plausible that F&M Trust's basis for terminating him was pretextual and that, based on temporal proximity, his termination was causally connected to his renewed request for an accommodation. See, e.g., Jalil, 873 F.2d at 709 (noting timing of plaintiff's firing "could suggest the very real possibility that [the employer]

---

[6] Neither party discusses whether Refat's purported request for a religious accommodation constitutes protected activity under the statute. See 42 U.S.C. § 2000e-3(a). At a glance, Refat's Jumu'ah requests do not appear to oppose any action made unlawful under Title VII, nor does he allege pretermination participation in any proceeding pursuant to a Title VII complaint. See EEOC v. N. Mem'l Health Care, 908 F.3d 1098, 1102 (8th Cir. 2018) (applicant whose job offer was rescinded after she requested religious accommodation failed to state a claim for Title VII retaliation because "merely requesting a religious accommodation is not the same as opposing the allegedly unlawful denial of a religious accommodation"). We are cognizant of the Supreme Court's broad construction of "protected activity" under Title VII's antiretaliation provision. See, e.g. Thompson v. N. Amer. Stainless, LP, 562 U.S. 170, 173-74 (2011) (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 62-63 (2006)). We further note that our court of appeals construes the Americans with Disabilities Act ("ADA") to prohibit "retaliation against an employee for requesting an accommodation." See Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 188 (3d Cir. 2010) (citing Shellenberger, 318 F.3d at 191); see also Ruggiero v. Mount Nittany Med. Ctr., 736 F. App'x 35, 41 (3d Cir. 2018) (nonprecedential) (noting "good faith request for an accommodation . . . was protected activity under the ADA sufficient to support a retaliation claim"). Yet Title VII and the ADA are distinct statutes, and the Supreme Court has rejected the contention that Title VII includes a freestanding failure-to-accommodate claim, in direct contrast with the ADA. Compare Abercrombie & Fitch Stores, 575 U.S. at 771 (providing "the rule for *disparate-treatment* claims based on a failure to accommodate a religious practice") (emphasis added), with Capps v. Mondelez Glob., LLC, 847 F.3d 144, 157 (3d Cir. 2017) (listing elements of ADA failure-to-accommodate claim). Absent briefing on this issue, we assume without deciding for the purposes of summary judgment that Refat's request constitutes protected activity under Title VII.

14

seized upon this instance of insubordination to fire" him (internal citation and quotation marks omitted)).  We are again mindful that "[c]redibility determinations are for the factfinder and are inappropriate at the summary judgment stage."  See Carvalho-Grevious, 851 F.3d at 262 (citing Anderson, 477 U.S. at 255).  Accordingly, these claims too must be decided by the jury.

### IV. Conclusion

We will deny F&M Trust's motion (Doc. 20) for summary judgment.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:   June 24, 2021